IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TASLID INTERESTS, INC. and KATY MOTELS, INC. dba MEMORIAL INN & SUITES | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 4:18-cv-1692 |
| ARCH SPECIALTY INSURANCE COMPANY | § § § | |
| *Defendant.* | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Taslid Interests, Inc. and Katy Motels, Inc. dba Memorial Inn & Suites ("Plaintiffs") respond to the motion for summary judgment (Dkt. 19) filed by Defendant Arch Specialty Insurance Company ("Arch").

## TABLE OF CONTENTS

I. NATURE AND STAGE OF THE PROCEEDINGS……………………………………………-1-

II. ISSUES TO BE RULED UPON……………………………………………………………… -1-

III. SUMMARY JUDGMENT EVIDENCE……………………………………………………-2-

IV. FACTS………………………………………………………………….…………….....…....-3-

V. SUMMARY OF THE ARGUMENT…………………………………………………………-7-

VI. ARGUMENT AND AUTHORITIES……………………………………………..…….....-9-

A. The summary judgment standard applicable to this first-party insurance case is well-settled………………………………………………………………………………………...-9-

B. The Court should deny Arch's Motion for Summary Judgment on Plaintiffs' Breach of Contract Claim…………………………………………………………………………………..…-10-

1. Plaintiffs satisfied their initial burden to show "some evidence" of a covered cause of loss supporting its breach of contract claim, and Arch concedes this point…………………………..-10-

2. Arch fails to meet its summary judgment burden to prove applicability of the exclusions of the Policy……………………………………………………………………………………..…-15-

a. Arch's own evidence acknowledges that a substantial portion of the Property was damaged by wind, which defeats summary judgment as to its claimed policy exclusions…………………….-17-

b. Arch's own meteorological evidence did "not account for tornadoes," had a margin of error of "plus or minus 20 percent," and did not even analyze the area near the Property………………..-19-

c. Arch cannot support its "flood" exclusion by merely offering a conclusory statement of its adjuster with no further proof………………………………………………………………....-20-

d. Arch's contradictory and conclusory evidence fails to satisfy its burden……………………-21-

3. Even if the burden shifts back tot Plaintiffs to show Arch's exclusions are inapplicable, summary judgment is inappropriate because Plaintiffs meet their burden to show, at minimum, genuine fact issues as to the applicability of the exclusions……………………………………………...-22-

a. There is evidence contradicting, or at minimum creating a fact issue regarding Arch's argument that the Policy's "no covered cause of loss" limitation applies………………………………….-23-

b. There is significant evidence contradicting, or at minimum creating a material fact issue regarding, Arch's argument that the damages to the Property were due to "wear and tear, deterioration, and inadequate maintenance."……………………………………………..-23-

c. There is significant evidence contradicting, or at minimum creating a material fact issue regarding, Arch's argument that "flood water" exclusion applies here…………………………..-25-

d. Arch's attack on Plaintiff's expert fails……………………………………………………….-26-

C. This Court should deny Arch's motion for summary judgment on Plaintiffs' extracontractual claims……………………………………………………………………………………....…-27-

D. The Court should deny Arch's motion seeking application of the actual case value limitation………………………………………………………………………………………....-28-

1. By failing to plead the ACV limitation as an affirmative defense, Arch waived it………………………………………………………………………………………………-29-

2. Even if the Court finds no waiver, Arch's motion fails because Arch asks the Court to reward it for its own breach of the Policy and violations of Texas law……………………………….-30-

a. The jury should be able to calculate Plaintiffs' actual damages sustained by Arch's failure to provide any benefits under the Policy…………………………………………………….....-30-

b. Arch's prior material breach of the Policy prevents it from enforcing the ACV limitation……………………………………………………………………………....…-32-

c. Arch's refusal to pay for repairs rendered Plaintiffs' performance impossible, and Arch has waived, or is estopped from relying on, the ACV limitation…………………………....…..-34-

VII. CONCLUSION……………………………………………………………………..…-34-

## **TABLE OF AUTHORITIES**

## **CASES**

*15625 Ft. Bend, Ltd. v. Sentry Select Ins. Co.*, 991 F. Supp.2d 932, 937 (S.D. Tex. 2014) .....- 34 -

*Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) - 31 -

*Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) ...... - 8 -,-17-,-23-

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) -9-,10 -, -23-

*Ayoub v. Chubb Lloyds Ins. Co.*, 641 F. App'x 303, 307 (5th Cir. 2016) .........................-2-,- 30 -

*Bailey v. Farmers Union Co-operative Ins. Co. of Neb.*, 498 N.W.2d 591, 598 (1992) ..........- 35 -

*Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) .............. - 10 -, -17-

*Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 360 (5th Cir. 2010) ...................................- 16 -

*C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co.*, 453 F. App'x 439, 442 (5th Cir. 2011) .........- 11 -

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...........................................- 23 -

*Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 267 (5th Cir. 2009)..- 17 -

*D & S Realty, Inc. v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1, 15-16 (Neb. 2012)............- 34 -

*First Baptist Church of Bedford*, 268 S.W.3d 828 ...............................................- 33 -

*Frost National Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ...........................................................................................- 31 -

*Ghorman v. N.H. Ins. Co.*, 159 F. Supp.2d 928, 934 (N.D. Tex. 2001) ...........................- 32 -

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) - 11 -

*Giles v. GE*, 245 F.3d 474, 491 (5th Cir. 2001) ...............................................- 31 -

*Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008)- 16 -

*Guideone Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 828 (Tex. App.—Fort Worth 2008, no pet.) .......................................................................- 32 -

*Hahn v. United Fire & Cas. Co.,* No. 6:15-CV-00218 RP, 2017 U.S. Dist. ....................- 8 -, -16-

*Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) ..............................- 34 -

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(per curiam)............................- 17 -

*McPherson v. Rankin*, 736 F.2d 175, 180 (5th Cir. 1984) ................................. - 10 -, -22-

*Mid-Continent Cas. Co. v. Petro. Sols., Inc.*, No. 4:09-0422, 2016 U.S. Dist................- 11 -, -30-

*Moriel*, 879 S.W.2d .........................................................................- 33 -

*Mustang Pipeline Ins. Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) .........................................................................................- 34 -

*Nat'l Lloyds Ins. Co. v. Lewis*, No. 09-13-00413-CV, 2015 Tex. App....................- 33 -

*Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009) ......................- 23 -

*Standard Waste Sys. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010)................- 8 -

*State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998).........................- 11 -

*State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 447 (Tex. 1997)...........................- 11 -

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994) .............................- 32 -

*Ward v. Merrimack Mut. Fire Ins. Co.*, 332 N.J. Super. 515, 522, 753 A.2d 1214, 1218 (Super. Ct. App. Div. 2000)........................................................................- 35 -

*Zaitchick v. Am. Motorists Ins. Co.*, 554 F. Supp. 209, 217 (S.D.N.Y. 1982)..........................- 35 -

III

## STATUTES

Fed. R. Civ. P. 56(a)................................................................................................- 10 -

Sections 541 and 542 of the Texas Insurance Code............................................- 27 -

Tex. Ins. Code § 541.............................................................................................- 9 -

Tex. Ins. Code § 554.002......................................................................................- 8 -

Texas Deceptive Trade Practices Act ...................................................................- 7 -

Texas Insurance Code ...........................................................................................- 7 -

IV

## I.  NATURE AND STAGE OF THE PROCEEDINGS

This is a first-party insurance case arising out of significant wind damage to Plaintiff's hotel located at 9535 Katy Freeway (the "Property"). Plaintiffs had insured the Property with Arch continuously since March of 2015. The Property had withstood both the Memorial Day (2015) and Tax Day (2016) storms that struck Houston, sustaining no loss that necessitated filing a claim. Unfortunately, during Hurricane Harvey, Plaintiffs' hotel sustained significant damage to its roof, windows, and interior. After Plaintiffs promptly filed an insurance claim, Arch's own adjuster, inspecting the property approximately 9 days after the damage, recognized that approximately 20 rooms—comprising 12.5% of the total rooms at the hotel—had "windows that were blown out by wind." That same adjuster found 12 pieces of plywood on the roof that were also ripped out by wind. Despite this overwhelming evidence of covered damage, and much to Plaintiffs' surprise and dismay, Arch denied their claim. To date, more than 17 months later, Arch has paid nothing. Arch moves for summary judgment, seeking to further absolve itself from any liability to its insured.

On the Court's deadline to do so, Arch filed a slew of additional motions in addition to its summary judgment motion. Arch moves to bifurcate the contract and extracontractual claims (Dkt. 16), to exclude the testimony of two of Plaintiffs' qualified experts, Tom Irmiter and Robert Hinojosa (Dkt. 17), and to strike or exclude the testimony of a third qualified expert, Stephen Strzelec (Dkt. 18). Plaintiffs agreed to make their experts and corporate representatives available after the expiration of the discovery period.

## II.  ISSUES TO BE RULED UPON

Regarding Arch's motion for summary judgment on Plaintiff's breach of contract claim, there are two distinct issues for the Court to rule upon. One, Arch concedes that Plaintiffs satisfy

- 1 -

their initial burden to show "some evidence" of coverage under their all-risks property Policy. Can Arch prove "beyond peradventure" all of the "essential elements" of its claimed Policy exclusions, and shift the burden back to Plaintiffs to rebut their evidence? Two, even assuming Arch can shift that burden back to Plaintiffs, is there "some evidence" of a covered cause of loss sufficient to defeat summary judgment on Plaintiff's contract claim?

Arch's entire argument for Plaintiff's extracontractual claims hinges on the dismissal of Plaintiffs' breach of contract claim. If the Court rules for Plaintiffs on the contract claim, the Court should rule in their favor on the extracontractual claims. Further, the MSJ record contains substantial, compelling evidence confirming Defendant's violations of the Texas Insurance Code and corresponding common-law duties, evidence to be construed in favor of Plaintiffs at this stage.

Arch alternatively argues that if there is coverage under the Policy, Plaintiffs are limited to actual cash value of the Policy as opposed to the bargained-for replacement cost value. If there is coverage – which necessarily means Arch has wrongfully withheld payment to Plaintiffs – can Arch benefit from a policy provision that no longer applies after the denial, that Defendants failed to even plead as an affirmative or limiting defense in violation of the Fifth Circuit's *Ayoub v. Chubb Lloyds Insurance Company* decision, and that illogically seeks to limit Plaintiffs' recovery?

### III. SUMMARY JUDGMENT EVIDENCE

| Ex. 1 | Loss Run Report |
|-------|-----------------|
| Ex. 2 | Deposition of Robert Haynes (excerpted) ("Haynes Dep.") |
| Ex. 3 | Affidavit of Anwar Kajani ("Kajani Aff.") |
| Ex. 4 | Declaration of Tom Irmiter ("Irmiter Decl.") |
| 4-A | Irmiter CV |
| 4-B | FBS and RJH Report |

| | |
|---|---|
| 4-C | FBS supplemental report |
| 5 | Declaration of Robert Hinojosa ("Hinojosa Decl.") |
| 6 | Strzelec Declaration ("Strzelec Decl.") |
| 6-A | Strzelec Disclosure and Report |
| 7 | Deposition of J. Phillip Dempsey (excerpts) ("Dempsey Dep.") |
| 8 | Deposition of Barry Tarnofsky (excerpts) ("Tarnofsky Dep.") |

## IV. FACTS

### The Property, the Underwriting Process, and the Policy

1.  Plaintiffs own the property located at 9535 Katy Freeway, Houston, Texas 77024 (the "Property"), which is branded as a Memorial Inn & Suites. (Dkt. 19-2, insurance policy). In March of 2015, Plaintiffs originally purchased a comprehensive insurance policy package from Arch, policy no. ESP7302074-00, for the initial policy period of March 27, 2015 through March 27, 2016 ("the "Policy"). (*See* Dkt. 19-2; Ex. 1, Loss Run Report, ARCH 541; Haynes Dep. 5:17-21). Arch renewed Plaintiffs' policy twice, including for the period of March 27, 2017 through March 27, 2018, under policy no. ESP7302074-02 which is the period at issue in this case. (Haynes Dep. 28:11-13; Ex. 1 at ARCH 542-43).

2.  Under the Policy, in exchange for Plaintiffs' substantial annual premium payment of $17,100.00, Arch provides coverage of up to $3,200,000 for damage to the Property caused by wind during the policy period of March 27, 2017 through March 27, 2018. (Dkt. 19-2, Policy, at ARCH 136). The Policy is an "all risks" type of Policy, meaning there is coverage for loss or damage to the property except for causes that are specifically excluded. (*See* 19-2.)

3.  During the first two Policy periods – March 2015 through March 2016, and March 2016 through March 2017 – Plaintiffs did not file a single claim. (Ex. 3, Kajani Aff. ¶¶ 4-5; Ex. 1 at ARCH 542-43). This was despite historic rainfall and flooding in Houston (including at the

Property) in both 2015 (Memorial Day storm) and 2016 (Tax Day storm). (Kajani Aff. ¶ 5.) In fact, the Property did not sustain any losses as a result of either of those two storms. (*Id.*)

4.   Indeed, when it came time to renew the Policy for a third term that would begin in March 2017, Arch did so. In fact, Arch's senior underwriter in charge of underwriting the Policy, Robert Haynes, testified that he found "no problematic loss history" with the condition of the Property prior to the 2017 renewal, and confirmed he was "perfectly comfortable" approving the renewal. (Haynes Dep. at 29:24-30:1, 33:17-19.) Haynes made clear that if there had been a history of losses at the Property, this "would have been a red flag." (*Id.* at 29:24-30:8.) Specifically, if Haynes had any "questions as to the condition of the roof," he "would have ordered an inspection." (*Id.* at 28:14-29:2.) But Arch did not order an inspection of the Property prior to the 2017 renewal; in fact, Arch *never* ordered an inspection of the Property, because Haynes "didn't feel like it was warranted." (*Id.* at 26:2-11). On Haynes's recommendations, Arch made the conscious decision to continue to accept premium payments from Plaintiffs, and insured the Property as of August 2017. (*See* Dkt. 19-2, Policy.)

### *Hurricane Harvey and Plaintiffs' Insurance Claim*

5.   On August 25, 2017, Hurricane Harvey, one of the most devastating natural disasters in American history, made landfall in Texas. During Harvey, the Property suffered significant damage to the roof and windows, which resulted in significant interior leaks emerged throughout the Property. (*See* Dkt. 19-5, Dempsey Decl., ¶ 5, Dkt. 19-6, Dempsey Report, at ARCH 1108, 1138; Ex. 4, Declaration of Tom Irmiter ("Irmiter Decl.") ¶ 13; Ex. 5, Declaration of Robert Hinojosa ("Hinojosa Decl.") ¶ 8.)   On or about August 30, 2017, Plaintiffs promptly filed an insurance claim with Arch. (*See* Ex. 1 at ARCH 543).

- 4 -

6.   After Plaintiffs reported the claim, Arch hired a third-party adjuster called McLarens to inspect the Property. (*See* Dkt. 19-6). McLarens then assigned an individual named J. Phillip Dempsey to the claim, who inspected the property on September 7, 2017 (*Id.* at ARCH 1106). Dempsey prepared a report recognizing that out of the 160 rooms at the Property, approximately 20 of them – or 12.5% of the total rooms – had "windows that were blown out by wind":

**Cause of Damage**

Our inspection revealed that a small portion of damages to the loss location were a result of wind. We observed windows that were blown out by wind in approximately 20 units. The primary cause of damage was wind driven rain or rain entering through small unsealed openings in the elevations and roof.

(*Id.* at ARCH-1109). Dempsey included 40 photos in his report, and those photos told the story of the significant destruction suffered by the Property, including to the "blown out windows" and plywood on the roof that was also ripped out by wind. (*Id.* at ARCH 1113-15, 1129-31) Dempsey testified that he took "approximately 200 photos," but only included 40 of what he characterized as a "good representation of the damage." (Ex. 7, Deposition of J. Phillip Dempsey ("Dempsey Dep.") at 58:6-17.)

7.   Despite this substantial and obvious damage to the Property that Dempsey acknowledged was due to wind, Arch issued a reservation of rights letter on September 25 that listed several exclusions to coverage, including the "flood" exception and the "No Covered Cause of Loss" limitation. (Dkt. 19-3, September 25, 2017 Reservation of Rights Letter).

8.   The very same day it sent reservation of rights letter, September 25, Arch hired Envista Forensics to perform an inspection of the Property. (Dempsey Dep. at 54:10-13.) Incredibly, Arch did not send *any* information (photographic or otherwise) to Envista showing the significant wind damage its adjuster, Phillip Dempsey, had documented on September 7. (*See id.* 57:8-59:1

Ex. 8, Deposition of Barry Tarnofsky ("Tarnofsky Dep.") at 52:7-24). On October 6, 2017, nearly six weeks after the property was damaged, and a month after Phillip Dempsey did his first inspection, Erik Wetzler of Envista inspected the Property (Tarnofsky Dep. at 42:12-14).

9.   Unsurprisingly, Wetzler's report, completed on October 20, 2017, rubber-stamped the coverage denials from Arch's reservation of rights letter. (*See* Dkt. 19-11, Envista Report). On December 10, 2017, Arch sent a letter denying the claim (the "Denial Letter"). (Dkt. 19-9) The Denial Letter contained the same two exclusions/limitations to coverage that were in the previously-sent reservation of rights letter. (*Id.*).

10. Importantly, in reaching this conclusion, Arch hid critical evidence and reporting from its initial field adjuster Phillip Dempsey, and did not disclose to its subsequent consultant, Envista, the written and photographic proof that a substantial wind event occurred at this property**.** (*See* Dempsey Dep. at 54:10-13; Tarnofsky Dep. at 52:7-24.)

11. The Denial Letter, Dempsey's report, and the Envista Report were rife with unreasonable contradictions. In the Denial Letter, Dempsey recognized the "damages that were created as a result of wind blowing out certain windows," but stated that Envista's opinion was that there was "no wind or wind-borne damage to the building envelope or roof system caused by the effects of Hurricane Harvey." (Dkt. 19-9 at ARCH-233). According to Envista, the wind speeds were not enough to cause damage to the Property, yet somehow the wind caused 20 windows to be "blown out of the building." (*See* Dkt. 19-11 at ARCH-32; 19-6 at ARCH-1109). While 20 windows were "blown out by wind" and 12 pieces of plywood were "blown loose" on the roof, Arch nonetheless denied the claim for interior water damage because of "already present deficiencies in the roof membrane and building envelope.) (Dkt. 19-6 at 1109; 19-9 at ARCH 233.)

12. Despite the wind damage found by Dempsey, not only did Arch did not even bother investigating wind speeds at or around the Property, it did not even examine wind speeds *specific to the City of Houston or Harris County*. The "Weather Data" incorporated within the Envista report consists of four pages of CompuWeather mapping of the Southeast Texas area affected by Hurricane Harvey. (Dkt. 11 at ARCH—79-82). The four separate maps purport to show peak sustained wind speed, peak wind gusts, total rainfall, and estimated maximum storm tide. (*Id.*) Critically, however, the Weather Data

- "does not account for tornadoes" (*id.* at ARCH—0079-80);

- has "a margin of error of plus or minus 20 percent" (*id.*); and

- does not specifically map, cite, or otherwise refer to the Property (or any nearby Properties), but simply uses a regional map of Southeast Texas (*see id.* at ARCH—0079-82).

***Litigation Ensues***

13. Stymied by its insurance carrier who happily accepted its substantial premium payment in exchange for an illusory promise to provide more than 3 million dollars in coverage to their property, Plaintiffs sued Arch for breach of the insurance contract along with violations of the Texas Insurance Code, Texas Deceptive Trade Practices Act, and breach of the duty of good faith and fair dealing. (*See* Dkt. 1, Plaintiff's Original Complaint, ¶¶ 20-53.)

14. Arch now files a motion for summary judgment seeking to be discharged from all liability in this matter on the basis that no coverage exists under the Policy. For the very first time, Arch cites an additional exclusion: "wear and tear, deterioration, and/or inadequate maintenance." (Dkt. 19 at 15.)

## V. SUMMARY OF THE ARGUMENT

Arch makes two significant legal concessions. First, Arch concedes that Plaintiffs meet their initial burden to show "some credible evidence" of a covered loss. *See* Dkt. 19 § VII; *Hahn v. United Fire & Cas. Co.,* No. 6:15-CV-00218 RP, 2017 U.S. Dist. LEXIS 53178, at *19 (W.D. Tex. 2017). This places the burden on Arch to prove that one of three exclusions or limitations to coverage entirely bar Plaintiff's breach of contract claim. Second, Arch concedes that dismissal of Plaintiffs' extracontractual claim depends on the predicate dismissal of Plaintiffs' breach of contract claim. So if Arch cannot prove that the exclusions bar Plaintiffs' breach of contract claim, its motion therefore fails as to both Plaintiffs' breach of contract and extracontractual claims.

Under Texas law, insurance policy exclusions and limitations are affirmative defenses for which Arch has the burden to prove at trial. *Standard Waste Sys. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010); TEX. INS. CODE § 554.002. When, as here, a movant for summary judgment bears the ultimate burden of proving an affirmative defense at trial, it must establish "beyond peradventure all of the essential elements of the defense to warrant judgment in his favor." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010). Arch's own summary judgment evidence falls well short of meeting this burden. The Court's analysis need go no further, and it should deny summary judgment on the breach of contract and extracontractual claims.

Even if the Court finds that the burden shifts to Plaintiff to rebut application of the exclusions, the Court should deny Arch's motion. Plaintiffs need only show "some support" tending to rebut Arch's argument for application of the exclusions, and if "reasonable minds

could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson,* 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

Arch's argument that Plaintiffs' extracontractual claims fail depends wholly on its contract claim first failing. For the reasons noted, the contract claim must survive summary judgment. But in any event, there is significant evidence – some of which was supplied by Arch itself – supporting Plaintiffs' allegations that Arch failed to act in good faith. Defendants' conduct is the very type of conduct prohibited by Section 541 of the Texas Insurance Code: refusing to pay a claim without first conducting a reasonable investigation, failing to attempt in good faith to effectuate a prompt and fair settlement, and otherwise engaging in unfair and deceptive acts. *See* TEX. INS. CODE § 541.

Lastly, Arch argues that if there is coverage, Plaintiffs should be limited to the actual cash value (ACV) of the Policy, instead of the replacement cost value (RCV) Plaintiffs paid for, because Plaintiffs failed to make repairs to the Property. As a threshold matter, Arch springs this argument on Plaintiffs for the first time on summary judgment. Arch never pleaded the ACV limitation, therefore waiving its ability to invoke it, and in any event is procedurally estopped from receiving relief on a matter not timely pled. In any case, Plaintiffs acknowledge that they have not made repairs to the Property; this, however, has been made impossible due to Defendant's breach of contract, and unreasonable denials and delays under the Texas Insurance Code. Arch has not paid them anything under the Policy. Arch attempts to avail itself of an ACV limitation when Arch's own conduct – its failure or refusal to make a rightfully owed payment – prevented Plaintiffs from having the money necessary to make the very repairs Arch castigates them for not making. Arch's conduct made Plaintiffs' compliance impossible, and Arch should

be estopped from asserting the actual cash value limitation.

## VI. ARGUMENT AND AUTHORITIES

### A. The summary judgment standard applicable to this first-party insurance case is well-settled.

A motion for summary judgment requires the movant to prove, as a matter of law, that the nonmoving party raised "no genuine issue as to any material fact" as to each claim subject to the motion. FED. R. CIV. P. 56(a). Before determining that a movant satisfied this burden, this Court must resolve all doubts and indulge all reasonable inferences in favor of the nonmoving party. *McPherson v. Rankin*, 736 F.2d 175, 180 (5th Cir. 1984). As long as there appears to be "some support" for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

Arch argues that exclusions and limitations to coverage bar Plaintiff's breach of contract claim. (Dkt. 19 at 15.) Under Texas law, these are affirmative defenses for which Arch has the burden to prove at trial. *Standard Waste Sys. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010); TEX. INS. CODE § 554.002. When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006).

**B. The Court should deny Arch's motion for summary judgment on Plaintiffs' breach of contract claim.**

    **1. Plaintiffs satisfied their initial burden to show "some evidence" of a covered cause of loss supporting its breach of contract claim, and Arch concedes this point.**

The law underlying Plaintiffs' breach of contract claim, along with the Parties' relative burdens, is well settled. The insured has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). In the context of a first-party insurance dispute, it is black-letter law that an insurance carrier who refuses to completely pay for covered damages breaches the insurance contract. *See, e.g., State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 447 (Tex. 1997). In determining whether an insurer failed to pay for covered damages, a court must look to the terms of the insurance policy to evaluate whether the underlying claim was covered. *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998).

Importantly, Arch does not (and cannot) dispute that Plaintiffs have satisfied this initial burden to establish coverage because, in part, the Policy is an "all-risk" policy. (*See* Dkt. 19 at 4-5). Under an "all-risk" policy, as the name implies, there is "coverage for all risks unless the specific risk is included." *Mid-Continent Cas. Co. v. Petro. Sols., Inc.*, No. 4:09-0422, 2016 U.S. Dist. LEXIS 133972, at *75 n.177 (S.D. Tex. 2016). Plaintiffs need only show "some credible evidence regarding the covered cause of loss" during the policy period to shift its initial burden for Arch to prove applicability of an exclusion. *See C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co.*, 453 F. App'x 439, 442 (5th Cir. 2011); *Hahn v. United Fire & Cas. Co.,* No. 6:15-CV-00218 RP, 2017 U.S. Dist. LEXIS 53178, at *19 (W.D. Tex. 2017).

Arch concedes that Plaintiffs meets their initial burden, because its entire argument for

dismissal of Plaintiff's breach of contract claim is based on the applicability of three limitations or exclusions to coverage. (Dkt. 19 § VII(B).) Specifically, Arch denied Plaintiffs' claim on the bases that "there was no wind-borne debris damage to the building envelope or roof system caused by the effects of Hurricane Harvey," "[t]he reported interior moisture damage incurred by infiltration through the roof and building envelope during Hurricane Harvey resulted from significant rainfall that exploited already-present [sic] deficiencies in the roof membrane and building envelope," and "there is no coverage for flood water." (*Id.;* Dkt. 19-9 at ARCH-00233-00234). Arch's motion makes clear that it assumes the burden to prove its exclusions and limitations as a starting point.

In any event, the record evidence shows there is no doubt that Plaintiffs meet their initial burden. First, Arch's own evidence supports Plaintiffs' initial burden. In the Denial Letter, Arch concedes "[d]uring our inspection, we did observe damages that were created as a result of wind blowing out certain windows, which allowed water to enter the respective units." (Dkt. 19-9 at 3.) This denial confirmed and embodied its adjuster Phillip Dempsey's earlier findings from his September 10 inspection that he had "observed windows that were blown out in approximately 20 units." (Dkt. 19-6 at ARCH—01110). Dempsey's report also noted, "[w]e did observe approximately 12 pieces of plywood that was [sic] blown loose on the perimeter vertical facade of the front lobby portion of the roof." (*Id.*) Completely disregarding its own findings, Arch somehow concluded that the rest of the damage to the Property was not covered because wind did not first cause the damage to the roof or walls. This alone satisfies Plaintiffs' initial burden.

Second, there is uncontradicted evidence of significant high winds very close to the Property as Hurricane Harvey struck Houston. Plaintiff's experts researched weather data

showing that nine different mesocyclone events were spotted within one half mile of the

Property, and a tornado also impacted this neighborhood. (Irmiter Decl. ¶ 13; Hinojosa Decl. ¶ 8;

Ex. 4-A, at 36-37 MEM INN). It is the opinion of Plaintiff's experts that those wind events

caused the damage to the Property:

> Based upon evidence collected from weather research and the physical inspection and roof, exterior wall and window assessment, we have concluded that the roof system, windows, some PTAC units, parapet walls, and some roof vents were damaged by the tornadic winds which occurred during the storm event. In addition, an overabundance of rain more than likely caused the roof system to be submerged causing water to damage the materials under the primary membrane, including adhesives, insulation and ceiling materials. These were still wet at the time of our inspection and will not recover.  In our opinion, the low-slope built-up roof must be completely replaced.  In our opinion, the current design of the parapet walls will not meet code at the time of the loss and will require complete replacement. In our report, complete replacement of the windows is necessary. The Work that has been done after the storm should be considered temporary in nature.

> Based upon our training, education, experience, a reasonable degree of building science and engineering certainty and the information gathered during our inspections and weather data search, it is more likely than not that the observed damage to the roofing system is a result of winds that occurred during Tropical Storm Harvey. On August 26-29, 2017 there was sufficient rain and wind to cause the above-referenced damage.

> Based on our interior inspection of the building, we have concluded that it is more likely than not, that the interior water damage we observed was a result of rainwater that entered after the winds created an opening to the building envelope during Tropical Storm Harvey, with the exception of the prior damage, as reported.

> Failure to completely remove and replace the damaged roof systems, windows, and parapets at the property will result in additional damage to the interior due to water intrusion.

> Damage to the property caused by wind and excessive rain occurred on or around August 26-28, 2017. Historic rainfall impacted the property during this time period where approximately 30" of rain was reported at the location of the Memorial Inn. According to our review of applicable weather data listed above in section 1, sustained windspeeds were estimated between 40-50 mpg with gusts reaching 50-60 mph.  The wind speeds reported are general to the area and can vary at specific locations.  They are subject to a +/- 20% margin of error and do not account for tornadoes.  Tropical Storm Harvey spawned many tornadoes, radar records indicated one which was reported 2 miles east of the site.  There were also several mesocyclones detected in the area, with one being reported ½ mile west

of the site.  In our opinion, the wind that occurred on or around August 27, 2017 was sufficient to cause damage to the windows, parapets and the roofing system. In our opinion, full replacement of the roof system is required.  Ensuing interior water damage from the storm event will require interior repairs.

The City of Houston has adopted the 2015 International Energy Code (IECC).  In our opinion, as the carrier has demostarted coverage for the removal and replacement of sections of the interior ceilings damaged by water from the storm, the remaining parts of the roof assembly up to the roof covering [working inside out] must also be replaced due to water damage. FBS cut roof cores and all cores were wet. In our opinion, additional coring will reveal either presence of water or signs that water did enter. Most if not all of the products used in the "roof Assembly" are not intended by the manufacturer to get wet and water damage to the materials directly behind the exterior roof envelope [the back side of the base sheet] are wet.

In our opinion, based on code language adopted by the City of Houston prior to the storm event, water damage to the interior ceilings from the storm event, which is not disputed, and discovery of wet materials in the roof assembly which includes not only the interior ceilings but also the roof assembly insulation, requires replacement of the wet insulation. In this case because of the concrete deck the only way to access the wet insulation is from the top, necessitating full roof replacement.

In our opinion, removal of the roof system to the concrete deck, drying out of the deck and installation of new above deck insulation with a new roof covering will be required as a result of damage from the storm event. Parapet walls will require replacement. New roof system will not allow for any gravel ballast.

In our opinion additional windows have been damaged by wind and require replacement. In our opinion, parging at the base of the structure was water damaged requiring removal and replacement.  In our opinion, the scope of repairs allowed for by the carrier was deficient.

\*\*\*

I have considered the other potential causes raised by the consultants for the insurance carrier and have ruled them out. The cause of the loss and the damages contained within our report is the August 26-28, 2017 windstorm. Wear and tear, maintenance, deterioration to the property, and surface water have been evaluated and accounted for in our opinions. The August 26-28, 2017 windstorm caused the need to replace this roof system, windows, and other repairs recommended in our report.

(Irmiter Decl. ¶ 13; Hinojosa Decl. ¶ 8).

Yet Arch, even after its adjuster acknowledged that 20 windows at the Property were "blown out," failed to do *any* investigation as to the wind speeds at or near the Property.

- 14 -

(Tarnofsky Dep. 31:4-23; Dempsey 60:21-25). Arch failed to do any investigation as to the minimum wind speed necessary to blow out 20 windows at the Property. (Tarnofsky Dep. 31:24-32:14). Arch failed to investigate whether mesocyclones or tornadic activity was in the area. (*Id.* 32:15-23). Incredibly, Arch failed to even investigate any wind data **_specific to Harris County or the City of Houston,_** relying only upon four pages of regional mapping with a 20% percentage of error and which specifically excluded reference to tornadoes. (19-11, Envista report, at 79-82).

Instead, Arch hinges its whole argument for the "no Covered Cause of Loss" limitation specifically (and the denial, generally) on the conclusions of its hired consultant, Erik Wetzel of Envista Forensics. (Dkt. 19 at 14; Dempsey Dep. 59:20-25). Wetzel inspected the Property on October 6, nearly six weeks after Hurricane Harvey damaged the Property. (*See* Dkt. 19-11 at ARCH-032). It was the Envista report that included the four pages of regional weather data; neither he, nor anyone else at Envista, performed any site-specific weather analysis at the Property. (*Id.* at 79-82). Envista's conclusions failed to account for the 20 blown out windows Arch had previously recognized, observing only in passing that "single-pane glass windows in multiple rooms . . . were reported to have been broken by wind-borne debris." (Dkt. 19-11 at ARCH—034). It is unclear where Envista obtained this information about "wind-borne debris," but what is most glaring about Envista's report is what it does not acknowledge: that approximately 20 windows that had been blown out at the Property, as well as the 12 piece of plywood on the roof, were caused by wind damage. (*See id.*; Dempsey Dep. at 67:8-15). The most likely explanation for this fact is that Arch failed to provide this information to Erik Wetzler, a fact confirmed by Arch's corporate representative Barry Tarnofsky:

> Q.    Okay.   If -- do you know whether McLarens even sent their photos to Envista showing all those windows that got "blown out" of this property?

A.  I don't recall that they did.  They normally would not send anything to the experts that might color their evaluation.

(Tarnofsky Dep. 52:19-52:24). Envista therefore never received photographs or any other information about the significant wind damage to the Property because of a purported fear of "coloring" Envista's opinion. In its motion, Arch effectively asks this Court to overlook Arch's failure to provide this critical information to its expert, and completely disregard the conclusive evidence of significant wind damage to the Property. The applicable law and evidence require otherwise.

Lest there be any doubt, Plaintiffs' easily satisfy their initial burden to show "some evidence" of a covered loss. *Hahn,* 2017 U.S. Dist. LEXIS 53178, at *19.

### 2.  Arch fails to meet its summary judgment burden to prove applicability of the exclusions to the Policy.

Where, as here, the movant for summary judgment bears the burden of proof on an affirmative defense such as an exclusion or limitation in an insurance policy, the movant "must establish beyond peradventure all of the essential elements of the defense to warrant judgment in his favor." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010); *Hahn v. United Fire & Cas. Co.,* No. 6:15-CV-00218 RP, 2017 U.S. Dist. LEXIS 53178, at *19 (W.D. Tex. 2017). "Exclusions are narrowly construed, and all reasonable inferences must be drawn in the insured's favor." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008). Because Arch bears the burden *at trial* of showing applicability of its exclusions, it likewise bears "the burden of producing evidence in support of its motion to establish that there existed no issue of material fact" regarding each element of its three claimed policy exclusions. *See Bayle v. Allstate Ins. Co.,* 615 F.3d 350, 360 (5th Cir. 2010).

- 16 -

Arch misstates the applicable burden, citing to the "eight-corners rule" and claiming it meets its burden simply by showing that an exclusion "arguably applies." (Dkt. 19 at 13). First, the "eight-corners rule" provides that "the petition's allegations and the policy's language determine the insurer's duty to defend." *Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 267 (5th Cir. 2009). This is a first-party property insurance case, not a third-party liability insurance case where the duty to defend (and the eight corners rule) is implicated. Second, Arch need do more than show "an exclusion *arguably*" applies – it must show "beyond peradventure all of the essential elements" of each exclusion. *Addicks Servs., Inc.*, 596 F.3d at 293.

If (and only if) Arch meets its burden to show the "essential elements" for its claimed policy exclusions, the burden shifts back to Plaintiffs to "designate specific facts showing . . . a genuine issue for trial." *See Bank of La.*, 468 F.3d at 241; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(per curiam). If Arch cannot make this showing, the Court need go no further because the burden would not shift back to Plaintiffs to rebut Arch's proof. *Little,* 37 F.3d at 1075.

> a. **Arch's own evidence acknowledges that a substantial portion of the Property was damaged by wind, which defeats summary judgment as to its claimed policy exclusions.**

Arch's own adjuster J. Phillip Dempsey concluded, upon inspecting the Property on September 7, 2017, that the windows of approximately 20 units – constituting approximately 12.5% of the entire Property – were "blown out by wind":

**Cause of Damage**

Our inspection revealed that a small portion of damages to the loss location were a result of wind. ==We observed windows that were blown out by wind in approximately 20 units. The== primary cause of damage was wind driven rain or rain entering through small unsealed openings in the elevations and roof.

**Repairs/Scope**

==We did observe approximately 20 units where the windows were blown out by wind.== The Insured has made repairs to some of the windows. We have requested the invoices to support the glass repairs.

(Dkt. 19-6 at ARCH-01110). Dempsey's report included photographs of those windows:

**Photo No. 35**

View of window that was blown out due to wind.



**Photo No. 36**

View of window blown out by wind.



- 18 -

Photo No. 37

View of window
blown out and carpet
damaged from water.



Photo No. 39

View of window that
was blown out and
not yet repaired.



Photo No. 40

More of same.



Based on those findings, Dempsey concluded "[w]e observed a moderate amount of

- 19 -

damage from wind to the loss location." (Dkt. 19-6 at ARCH-01108). Approximately one month

later, on October 6, 2017, Erik Wetzler of Envista Forensics inspected the Property and prepared

a report for Arch. (*See* Dkt. 19-11). Wetzler noted, without further explanation, that "single-pane

glass windows in multiple rooms . . . were reported to have been broken by wind-borne debris."

(Dkt. 19-11 at ARCH 0034). Yet, despite this undisputed photographic and documentary

evidence of wind damage to approximately 12.5% of the Property gathered by Arch itself, Arch

denied Plaintiff's claim.

> **b. Arch's own meteorological evidence did "not account for tornadoes," had a margin of error of "plus or minus 20 percent," and did not even analyze the area near the Property.**

The Envista report includes weather data purporting to show wind speeds near the

Property during Hurricane Harvey:

**WEATHER DATA**

Weather data for Hurricane Harvey, which affected the region between August 25 through 30, 2017, was obtained in a report from CompuWeather's Forensics Services Division. The weather report indicated peak sustained winds (one minute) in the area of the building were estimated to range between 40-50 miles per hour (mph). Peak gusts winds (3 second gusts) were estimated to range between 50-60 mph within the same area. Rain totals were estimated to range between 36-48 inches at the property. Weather data can provide an indicator of the conditions observed in the area and may not reflect the exact conditions experienced at the subject property. Additional data may be available at a later date. (Attachment B, Weather Data).

(*See* Dkt. 19-11 at ARCH—0033). The report concluded, apparently based on the "Weather

Data" attached to the report as Attachment B, that "[e]levated wind speeds that are capable of

causing wind damage to membrane roofing will typically cause damage to more susceptible

components, such as peripheral, light-weight cladding and rooftop appurtenances" but that the

roof at the Property "revealed an absence of wind-related damage." (*Id.*) This formed one of the

bases for Arch's denial of Plaintiffs' claim. (Dkt. 19-11 at ARCH-0234 ("[b]ased on the findings

of the retained structural engineer, the roof system and building envelope did not sustain wind

damage, which would have allowed water to enter.") The "Weather Data" incorporated within the Envista report consists of four pages of CompuWeather mapping of the Southeast Texas area affected by Hurricane Harvey. (*Id.* at ARCH—79-82). The four separate maps purport to show peak sustained wind speed, peak wind gusts, total rainfall, and estimated maximum storm tide. (*Id.*) Critically, however, the Weather Data

- "does not account for tornadoes" (*id.* at ARCH—0079-80);

- has "a margin of error of plus or minus 20 percent" (*id.*); and

- does not specifically map, cite, or otherwise refer to the Property (or any nearby Properties), but simply uses a regional map of Southeast Texas (*see id.* at ARCH—0079-82).

### c. Arch cannot support its "flood" exclusion by merely offering a conclusory statement of its adjuster with no further proof.

The only "evidence" Arch offers in support of the flood exclusion is the conclusory statement from its retained adjuster J. Phillip Dempsey that he "observed physical damage from water that entered the building under the doors of the rooms which was the result of accumulation of surface water and the overflow of neighboring bodies of water stemming from Hurricane Harvey." (Dkt. 19 at 16; Dkt. 19-6 at ARCH-1136). Arch fails to identify which doors of which rooms, or which "neighboring bodies of water" it refers to. (*See id.*) Nor does Arch include any photographs purporting to specify which portions of the Property it contends had flood water. Flood water typically would cause damage to the ground floor and any sub floors of the Property, but Dempsey noted water damage to the "upper sections of walls." (Ex. 6, Report of Stephen Strzelec Report, at 0927 MEM INN; 19-6 at ARCH—1110). In both his report (Dkt. 19-6) and denial letter (Dkt. 19-9), Dempsey simply quoted the language of the flood exclusion and declared that he found some flood damage. This is insufficient, alone, to support the

- 21 -

applicability of the flood exclusion.

### d. Arch's contradictory and conclusory evidence fails to satisfy its burden.

Taking all of this evidence and indulging all reasonable inferences in favor of Plaintiffs, this Court should deny Arch's motion. *McPherson* 736 F.2d at 180. Arch's own evidence fall far short of establishing "beyond peradventure all of the essential elements" of each of its three claimed policy exclusions. *Addicks Servs., Inc.,* 596 F.3d at 293. Indeed, its evidence is conclusory and self-contradictory as to the cause of damage at the Property, and therefore the applicability of the exclusions. Its denial letter is a perfect embodiment of this:

> The denial letter contradicts itself several times as Mr. Dempsey attempts to find any rationale for the contrary position taken by Arch. The building, as a result of hurricane Harvey, sustained loss of 20 blown out windows; however, the engineer is of the opinion that hurricane Harvey did not cause any damage to the building envelope. According to the engineer the wind speeds were not great enough to cause damage; however, somehow the wind to caused 20 windows to be blown out of the building. While 20 windows were blown out during the hurricane, most of the interior damage produced by water was caused by small openings in the walls and roof.

(*See* Strzelec report at 0942 MEM INN; Denial Letter at ARCH-0233-236.)

The Court need not even examine Plaintiffs' summary judgment evidence to deny Arch's motion.

### 3. Even if the burden shifts back to Plaintiffs to show Arch's exclusions are inapplicable, summary judgment is inappropriate because Plaintiffs meet their burden to show, at minimum, genuine fact issues as to the applicability of the exclusions.

Arch's own proffered summary judgment evidence fails to "establish beyond peradventure all of the essential elements" of its exclusions, and the Court needs no additional basis to deny Arch's summary judgment motion on Plaintiffs' contract claim. *Addicks Servs., Inc.* 596 F.3d at 293. But even if the Court finds that the burden does shift back to Plaintiffs to show

that Arch's exclusions are inapplicable, summary judgment on Plaintiffs' contract claim should be denied. Plaintiffs need only show a genuine issue of material fact as to Arch's exclusions to defeat summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A fact is "material" if "its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009) (internal citation omitted). As long as there appears to be "some support" for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson,* 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). There is more than enough evidence in the summary judgment record to meet Plaintiffs' burden to provide "some support" from which a jury will be able to determine that the Property's damages were caused by a covered cause of loss and not excluded. *Anderson*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505.

> **a. There is evidence contradicting, or at minimum creating a fact issue regarding, Arch's argument that the Policy's "no covered cause of loss" limitation applies.**

Plaintiffs already showed that there is substantial evidence indicating that there *was* a covered cause of loss under the Policy. *See supra,* § VI(B)(1). This exclusion is essentially the opposite, that there was *no* covered cause of loss, and so the evidence cited above satisfies Plaintiffs' burden to show "some support" from which the jury will be able to determine that this exclusion does not apply.

> **b. There is significant evidence contradicting, or at minimum creating a material fact issue regarding, Arch's argument that the damages to the Property were due to "wear and tear, deterioration, and inadequate maintenance."**

Arch next argues that the wear and tear, deterioration, and inadequate maintenance

- 23 -

exclusions apply to deny coverage. (Dkt. 19 at 15-16). Arch cites Wetzler's report, which referred to "significant rainfall that exploited already-present [sic] deficiencies in the roof membrane and building envelope." (Dkt. 19 at 16). Notably, this motion for summary judgment

When analyzing the basis for Arch's contention that there were "already present deficiencies," on the roof, it is important to note that Arch has insured the Property since March 27, 2015. (*See* Ex. 1, Loss Runs Report at ARCH-0541, Haynes Dep. 5:17-21). As the Court is well aware, Houston sustained massive rainfall and flooding on May 25-26, 2015 (the "Memorial Day Flood") and again on April 15, 2016 (the "Tax Day Flood").[1] Yet, despite this historic rainfall, Plaintiffs did not make an insurance claim during the first policy period, from March 27, 2015 through March 27, 2016, encompassing the Memorial Day Flood. (Ex. 1 at ARCH 541; Kajani Aff. ¶ 5.) Nor did Plaintiffs make a claim during the second policy period, March 27, 2016 through March 27, 2017, encompassing the Tax Day Flood. (Ex. 1 at ARCH 542; Ex. __, Kajani Aff. ¶ 5.) This is because, despite record amounts of rainfall that fell during each of those storms, the Property did not suffer any losses. (Kajani Aff. ¶ 5.)

Moreover, Barry Tarnofsky, Arch's corporate representative on claims and adjusting topics, testified that no one from Arch's claims team ever even attempted to determine whether the Property had sustained any damage due to either the Memorial Day or Tax Day Floods. (Tarnofsky Dep. 17:5-24). Neither Arch nor Envista conducted a single interview of anyone actually present at the Property before Hurricane Harvey. (*Id.* 18:25-19:4, 54:11-56:8).

Arch's position is further undermined by Robert Haynes, Arch's corporate representative testifying on policy underwriting issues, and also the individual responsible for underwriting the

---

[1] Taslid requests, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take

Policy. (*See* Haynes Dep. 6:21-25.) Haynes testified that he had the option to do an underwriting

inspection at the Property, but chose not to because he was satisfied with the aerial pictures he

had taken:

> Q.   Okay.  So you do have the right to do an underwriting inspection on any account you
> want to look at, right?
> A.   Yes.
> Q.   That is solely a choice that Arch can make, right?
> A.   Yes.
> Q.   Okay.  Did Arch ever exercise that option to do an underwriting inspection of this
> property, Memorial Inn & Suites?
> . . .
> A.   We did not because I didn't feel like it was warranted in this case.  I did an aerial –
> reviewed aerial pictures of the property as well as street views and felt comfortable with it
> and did not feel that it was warranted.
> . . .
> Q.   And so that goes from 2015, 2016, 2017, leading up to Hurricane Harvey, Arch made
> a decision it was never going to do a loss control survey or underwriting inspection of this
> property, right?
> A.   I made that decision, correct.

(Haynes Dep. 25:20 to 26:20)

After testifying that a loss control survey or underwriting inspection was unnecessary,

Haynes testified that there were no "problems" or "issues" with the roof or exterior of the

Property that would prevent him from recommending renewal of the Policy:

> Q.   Okay.  Can you zoom in and kind of look at the characteristics of the property
> you're underwriting?
> A.   Yes.
> Q.   Okay.  And did you do that for Memorial Inn & Suites prior to August 2017?
> A.   Yes.
> Q.   Okay.  Did you do it 2015, 2016, 2017?
> A.   Yes.
> Q.   Okay.  So no major problems with the roof system or exterior of this building
> based on your underwriting evaluation up to 2017, correct?
> A.   Yes, correct.
> Q.   (By Mr. Slania)  And you confirmed that and ended up renewing these policies,

judicial notice of the fact of the Memorial Day Flood of 2015 and the Tax Day Flood of 2016.

right?

A.   Correct.

Q.   Now, what if your due diligence had shown there are problems here? . . .What would you have been required to do?

A.   If I had any questions as to the condition of the roof, I would have ordered an inspection.

. . .

Q.   But you never even had any underwriting questions about condition of the roofs or exterior or anything like that, right?

A.   No, I did not.

(Haynes Dep. 27:23 to 29:6)

Despite this utter lack of evidence supporting the claimed exclusion, Arch nonetheless sent out a denial letter on December 10, 2017. (Dkt. 19-9, Denial Letter). The wealth of contrary summary judgment evidence is plainly at odds with Arch's contention that the damage to the Property was due to some "already present" deficiencies, wear and tear, or other maintenance issues. The Court should deny summary judgment on this point.

### c. There is significant evidence contradicting, or at minimum creating a material fact issue regarding, Arch's argument that "flood water" exclusion applies here.

As argued *supra*, § VI(B)(2)(c), the only "evidence" Arch offers in support of the flood exclusion is the conclusory statement from its adjuster Phillip Dempsey. Arch offers no additional proof, whether from the Envista report or otherwise, supporting this exclusion. Furthermore, Plaintiffs' competent expert opinions that the damages were due to rain that entered after wind opened the building envelope – not flood waters or any other cause – constitutes, at minimum, "some support" contradicting Arch's claimed flood exclusion. (Irmiter Decl. ¶ 13; Hinojosa Decl. ¶ 8). Anderson, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

### d. Arch's attack on Plaintiff's experts fails.

Arch makes the factual misstatement that "[n]owhere . . . do Plaintiffs' experts identify any storm created opening in the roof through which water entered." (Dkt. 19 at 17.) This is patently wrong. The experts' report finds that the "roof system, windows, some PTAC units, parapet walls, and some roof vents were damaged by the tornadic winds which occurred during the storm event." (Ex. 4-B, FBS Expert Estimate Report, § 4.0; Irmiter Decl. ¶ 13; Hinojosa Decl. ¶ 8). In the very next section of its brief, Arch acknowledges this, but attempts to discredit Plaintiff's experts' findings as "*ipse dixit*."[2]

Importantly, Arch does *not* attack the impeccable credentials of Plaintiffs' retained experts Tom Irmiter and Robert Hinojosa. As demonstrated throughout this brief, Plaintiff's qualified experts did an exhaustive investigation of the cause of loss to the Property. Arch has not yet deposed Plaintiff's experts, yet asks this Court to disregard their reasoned causation opinions at this stage. The Court should reject that plea, and permit the jury to weigh the credibility of the witnesses (experts and lay alike) at trial.

### C. This Court should deny Arch's motion for summary judgment on Plaintiffs' extracontractual claims.

Arch's sole argument for dismissal of Plaintiffs' extracontractual claims is that those claims cannot survive because Plaintiffs' contract claim should be dismissed. (Dkt. 19 at 20). The Court need go no further with its analysis because, as argued above, Plaintiff's breach of contract claim should proceed to trial. In any case, there is a wealth of summary judgment evidence supporting Plaintiffs' claims under Sections 541 and 542 of the Texas Insurance Code,

---

[2] Arch also filed a motion to strike or exclude Plaintiff's experts (Dkt. 18), to which Taslid responds separately. The Court should deny that motion.

for breach of the common law duty of good faith and fair dealing, and under the Texas DTPA.

Plaintiffs' expert on claims handling, Stephen Strzelec, reviewed the claims file, the Reservation of Rights Letter, both the Dempsey and Wetzler, and the deposition testimony in this case, and drew several conclusions about Arch's claims handling:

> It is clear based on the documents reviewed and the deposition testimony that Arch and its claim handlers failed to meet minimum industry standards and failed to meet their obligations of good faith and fair dealing in the adjustment of this loss. This claim was denied prior to the completion of a reasonable investigation and the denial was based on assumptions, speculation and conjecture.
>
> Arch and Mr. Dempsey failed to provide the engineer with all relevant information in their possession prior to the completion of the engineering report. Further, once the report was received it was not reasonably reviewed, addressing, investigating, and resolving all issues, discrepancies, and questions raised in the report; when comparing report the to all the other information obtained during the investigation.
>
> Arch and Mr. Dempsey identified damages to the insured structure that provided significant information regarding the event that caused the loss. This information was not investigated further, nor was it supplied to the engineer to be addressed in his report
>
> Arch and Mr. Dempsey made contrary and conflicting statements in the denial letter, extending coverage for damages to the building envelope, and denying the balance of the claim as there was no damage to the building envelope.
>
> Arch and Mr. Dempsey failed to obtain site-specific weather information for the date of loss, relying solely on weather information for the general Houston area. Further, they failed to request site-specific information from the engineer as well.
>
> It is also clear that Arch failed to provide Mr. Dempsey and others with written guidelines, file handling requirements, claim standards and direction. The file is silent regarding the communication of guidelines and instructions.  Further, it appears clear that once the information is provided to Mr. Tarnofsky for review, no serious thought was given prior to authorizing Mr. Dempsey to deny the loss.  If Arch has adopted proper standards for the handling of claims, there is no indication that they have been reasonably implemented based on the actions taken in the handling of this loss.

(Strzelec Decl. ¶ 21; Strzelec Report at 0944-45, MEM INN.).

Evidence of Arch's conduct makes clear its violations of the Texas Insurance Code, particularly

- 28 -

its refusing to pay a claim without first conducting a reasonable investigation, failing to attempt in good faith to effectuate a prompt and fair settlement when liability was reasonably clear, and engaging in unfair and deceptive acts. *See* Tex. Ins. Code § 541.

**D. The Court should deny Arch's motion seeking application of the actual cash value limitation.**

Arch's final argument is that the actual cash value (ACV) measure should apply to Plaintiff's damages under the Policy, and not the replacement cash value (RCV) measure. This argument fails for two reasons. One, Arch failed to plead this argument in its answer, and asserts it for the first time in its motion. Because application of ACV is a coverage limitation for which Arch has the burden to plead and prove, Arch's failure to do so operates as a waiver of the argument. Two, even if this Court finds no waiver, Arch's own conduct – namely, refusing to pay anything under the Policy that would allow Plaintiff to make repairs – is the sole cause of Plaintiffs' inability to make repairs to the Property. Arch effectively asks this Court to punish Plaintiffs for failing to fix their Property with their own funds. The Court should reject that argument.

**1. By failing to plead the ACV limitation as an affirmative defense, Arch waived it.**

Arch has not pleaded the ACV limitation, and makes this argument for the first time on summary judgment. (*See* Dkt. 7, Answer) (no mention of ACV limitation). The ACV limitation provides

> d. We will not pay on a replacement cost basis for any loss or damage:
> (1) Until the lost or damaged property is actually repaired or replaced; and
> (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

(Dkt. 19-2 at ARCH—158).  As briefed extensively in this response, an insurance company bears

the burden to show an exclusion or limitation to coverage. *Ayoub v. Chubb Lloyds Ins. Co.*, 641 F. App'x 303, 307 (5th Cir. 2016). "Similar rules govern an insured's damages." *Id.* Although an insured bears the burden to prove the extent of its loss, an insurer bears the burden to show "contractual limitation of liability—that is, a cap on what the insurer will have to pay out, independent of the value of the loss." *Id.*

In *Ayoub*, the Fifth Circuit confronted a similar clause, holding it was a limitation on liability for which the insurer bore the burden of proof. *Id.* at 309. The clause at issue in *Ayoub* provided, in relevant part, "[i]f you have a covered partial loss to your dwelling or another structure, and do not begin to repair, replace or rebuild the lost or damaged property within 180 days from the date of loss, we will only pay the reconstruction cost less depreciation." *Id.* at 306. Reading this provision in conjunction with the language characterizing this section as a "limit of liability for covered losses," the Court rejected the insurer's argument that this was a "measure of damages" for which the insured had the burden of proof. *Id.* at 309.

The Court should reach the same conclusion here. The plain language of the applicable provision begins, "**[w]e will not pay** on a replacement cost basis" if certain events transpire. (Dkt. 19-2 at ARCH—158) (emphasis added). This is very clearly a "cap on what the insurer will have to pay out, independent of the value of the loss," as found in *Ayoub. See* 641 F. App'x at 307.

As a limitation of coverage for which Arch bore the burden of proof, Arch needed to plead the ACV limitation as an affirmative defense. *Mid-Continent Cas. Co.*, 612 F.3d at 398; TEX. INS. CODE § 554.002. Arch did not. Failure to raise an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure in generally results in a waiver. *See, e.g., Giles v. GE*,

- 30 -

245 F.3d 474, 491 (5th Cir. 2001). Arch's assertion of this unpled argument at this stage – in a dispositive motion, filed more than four months after the pleading deadline, and based on no new information – has caught Plaintiffs by surprise and would result in great prejudice if the Court allows it to proceed. The Court should deny Arch's point on those grounds.

> **2. Even if the Court finds no waiver, Arch's motion fails because Arch asks the Court to reward it for its own breach of the Policy and violations of Texas law.**

Even if the Court finds no waiver, summary judgment is inappropriate on the ACV limitation. As a threshold matter, Plaintiffs willingly acknowledge that they have not made any repairs to the Property. This is precisely why the Plaintiffs filed this lawsuit: Arch has not paid any of the money it owes the Plaintiffs under the Policy. If Arch's argument wins the day, this would permit Arch to reap the benefits of its violations of the Texas Insurance Code violations and force the Plaintiffs to self-fund repair efforts for which they purchased insurance in the first place. This is not what the Policy intended, or what law or principles of equity provide.

> **a. The jury should be able to calculate Plaintiffs' actual damages sustained by Arch's failure to provide any benefits under the Policy.**

Arch is liable for breach of contract if a valid contract exists and its refusal to perform under the contract damaged Plaintiffs. *See Frost National Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The rule for measuring breach-of-contract damages is to award the non-breaching party "all actual damages necessary **to put it in the same economic position in which it would have been had the contract not been breached**." *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) (emphasis added). In the context of insurance, failure to pay a covered claim is a per se breach of

contract which entitles the insured to the amount of actual damages caused by the breach. *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994).

Regarding property insurance, it is fundamental that policies may be purchased on a replacement cost value or actual cash value basis. Replacement cost value (RCV) means the amount necessary to repair or replace the property, which includes "any cost that an insured is likely to incur in repairing or replacing a covered loss." *Ghorman v. N.H. Ins. Co.*, 159 F. Supp.2d 928, 934 (N.D. Tex. 2001). Actual cash value (ACV) is the cost to repair or replace the property less any applicable depreciation. *See id.* Withholding *any* component of the cost to repair or replace the property, regardless of whether the cost is incurred, constitutes breach of contract as a matter of law. *Id.* at 935 (granting summary judgment because carrier withheld contractor's overhead and profit and sales tax, even though costs had not been incurred); *see also Guideone Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 828 (Tex. App.— Fort Worth 2008, no pet.).

Here, there is no dispute that Plaintiffs purchased RCV benefits under the Policy issued by Arch, and that Arch accepted a substantial premium for providing those benefits. (Dkt. 19-2, Policy, at ARCH-0136.) There is also no dispute that Arch denied Plaintiffs' claim and has refused to pay for any wind damage to the Properties. (*See* Dkt. 19-9, Denial Letter.) Because of Arch's denial, Plaintiffs were unable to make full and proper repairs to the Properties. (Kajani Aff. ¶ 6.) Had Arch at least paid a reasonable ACV amount on the claim made in August 2017, then Plaintiffs could have at least begun repairs to the storm-ravaged Properties. (*Id.*)

More importantly, though, regardless of whether the Policy provides for ACV or RCV coverage, Arch breached the contract by failing to fulfill *any* of its obligations. *See Moriel*, 879

S.W.2d at 17; *First Baptist Church of Bedford*, 268 S.W.3d 828. When a carrier breaches the insurance contract by denying or underpaying a claim, the actual damages sustained by the carrier's breach are calculated by a jury. *See Nat'l Lloyds Ins. Co. v. Lewis*, No. 09-13-00413-CV, 2015 Tex. App. LEXIS 1635, at *44-45 (Tex. App.—Beaumont Feb. 19, 2015). Because the Policy here provided for replacement cost benefits, the jury must include *all* amounts that were owed under the Policy, inclusive of depreciation, which should have been paid during the claims process—this is true regardless of whether repairs were ever made. *See id.* Here, Plaintiffs' experts have identified $1,456,204.53. in replacement cost benefits that went unpaid during the claims process. (Irmiter Decl. ¶ 18.)

> **b. Arch's prior material breach of the Policy prevents it from enforcing the ACV limitation.**

Arch's argument for application of the ACV limitation assumes that its other arguments lose, and that "there is coverage" under the Policy. (Dkt. 19 at 23). This illustrates the weakness of its argument. As noted in the previous section, if Plaintiffs can show coverage, this will result in, at minimum, a breach of the Policy by Arch. One case from the Supreme Court of Nebraska illustrates why Arch should not be able to invoke the ACV limitation:

> If the insured has contracted for replacement cost coverage, **the insured will normally be entitled under the policy to an immediate payment representing the actual cash value of the loss, which can be used as seed money to start the repairs.** Depending on the policy, the acceptance of this actual-cash-value payment may trigger a more limited time constraint for completion of the repairs, as it does here. If the insured repairs or replaces the property within the time period stated in the policy, the insured will then be entitled to an additional payment for the amount by which the cost of the repair or replacement exceeded the actual cash value payment. **When the insurer has not breached its obligations under the policy, provisions which mandate actual repair or replacement as a condition to recovery of replacement cost damages are almost universally found enforceable.** In other words, the repair/replace condition is neither ambiguous nor unconscionable. **If the insurer accepts**

**liability for the loss** under the standard indemnity portion of the policy, **the insured is bound to comply with the repair/replace condition before the insured can recover replacement costs**.

*D & S Realty, Inc. v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1, 15-16 (Neb. 2012) (internal citations omitted) (emphasis added). As the *D&S* court makes clear, a carrier's ability to enforce an ACV limitation presupposes that the carrier has properly made the ACV payment allowing the insured to make the repairs. *See id.* That, of course, did not happen in this case. Under the terms of the Policy, Arch was obligated to pay for damages on an RCV basis. Arch cannot refuse to pay for repairs during the claims process and then request a reduction of legal damages on the basis that those repairs were not made.

Arch's complete denial of the claim was a material breach of the Policy that waived its right to rely on any payment restrictions in the same Policy. It is fundamental that when one party commits a material breach of a contract, the remaining obligations and conditions under the contract cannot be enforced. *Mustang Pipeline Ins. Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). While the question of whether a breach is material is typically resolved by the factfinder in light of several non-exclusive factors, some breaches are material as a matter of law. *See id.* at 199. Material breaches are those that defeat the purpose of the contract and deprive the plaintiff of the benefit that would have been realized by full performance. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).

Arch's failure to provide *any* benefits and its complete denial of Plaintiffs' claim was a material breach of the Policy that defeated the entire purpose of the contract. *See Mustang Pipeline*, 134 S.W.3d at 196; *see also 15625 Ft. Bend, Ltd. v. Sentry Select Ins. Co.*, 991 F. Supp.2d 932, 937 (S.D. Tex. 2014) (explaining a "policy of property insurance is a personal

- 34 -

contract for indemnity . . .”). Arch cannot utilize certain contractual terms for its benefit while ignoring others.

> **c. Arch's refusal to pay for repairs rendered Plaintiffs' performance impossible, and Arch has waived, or is estopped from relying on, the ACV limitation.**

Courts in other jurisdictions have rejected similar arguments to Arch's here on impossibility, estoppel, waiver, and other equitable theories. *See Ward v. Merrimack Mut. Fire Ins. Co.*, 332 N.J. Super. 515, 522, 753 A.2d 1214, 1218 (Super. Ct. App. Div. 2000) (reversing and remanding in favor of Plaintiff, recognizing "an insurer is estopped from arguing that an insured cannot demand replacement costs under a policy provision requiring actual replacement of the damaged property as a precondition to recovery where the insurer's conduct frustrates the insured's ability to satisfy the precondition"); *Zaitchick v. Am. Motorists Ins. Co.*, 554 F. Supp. 209, 217 (S.D.N.Y. 1982) (carrier's refusal to pay any money, even the actual cash value of the loss, made it impossible for insureds to replace their home and comply with the Policy); *Bailey v. Farmers Union Co-operative Ins. Co. of Neb.*, 498 N.W.2d 591, 598 (1992) (where carrier's refusal to pay even the actual cash value of the structure, carrier waived term of the policy requiring replacement of the structure to recover replacement cost").

## VII. CONCLUSION

Plaintiffs respectfully request that this Court deny Arch's motion for summary judgment in all respects.

Respectfully submitted,

**RAIZNER SLANIA LLP**

*/s/Jeffrey L. Raizner*
Jeffrey L. Raizner

- 35 -

Texas Bar No. 00784806
Federal ID No. 15277
jraizner@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Telephone: (713) 554-9099
Facsimile: (713) 554-9098

Of Counsel:

Andrew P. Slania
Texas Bar No. 24056338
Federal ID No. 1057153
aslania@raiznerlaw.com
Amy B. Hargis
Texas Bar No. 24078630
Federal ID No. 1671572
ahargis@raiznerlaw.com
Ben Wickert
Texas Bar No. 24066290
Federal ID No. 973044
bwickert@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Telephone: (713) 554-9099
Facsimile: (713) 554-9098

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 18th day of February, 2019, a true and correct copy of the foregoing document was delivered to all counsel of record, via the Court's electronic notice system, in accordance with the Federal Rules of Civil Procedure:

Christopher M. Raney (Attorney-In-Charge)
**Gordon Rees Scully Mansukhani LLP**
State Bar No. 24051228
Federal Bar No. 609101
<u>craney@grsm.com</u>
1900 West Loop South, Suite 1000
Houston, TX 77027
(713) 961-3366 (Telephone)
(713) 961-3938 (Facsimile)

**ATTORNEYS FOR DEFENDANT**
**ARCH SPECIALTY INSURANCE COMPANY**