IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TASLID INTERESTS, INC. and KATY MOTELS, INC. dba MEMORIAL INN & SUITES<br>   *Plaintiffs,*<br><br>v.<br><br>ARCH SPECIALTY INSURANCE COMPANY<br>   *Defendant.* | § § § § § § § § § § § | Civil Action No. 4:18-cv-1692 |

**DECLARATION OF THOMAS J. IRMITER**

1. My name is Thomas Irmiter. I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts contained in this declaration, and I attest that the facts are true and accurate.

2. I am the owner and president of Forensic Building Science, Inc. ("FBS"), a company I founded in 2004. I am a Certified Building Official and I have over 40 years of experience in the construction and building inspection industry and have been performing expert work for over 25 years. I have a certification from Minneapolis Technical College/Minneapolis College of Design as an Architectural Plan Reviewer and Architectural Plan Designer. I am certified by the State of Minnesota as a Building Code Official. I was a member of National Association for the Remodeling Industry ("NARI") between 1989 and 2000, as president of the Minnesota Chapter for several runs and running their Ethics Committee for 10 or 12 years, and the NARI Certified Remodeler Test. My current CV is attached as Exhibit A.

3. In 1984, I bought my father's business and ran that business until 2000. I grew the business from four or five employees to 75 employees, into a full design, build company with an electrical

EXHIBIT 2

division, a painting division, staff architects producing our own designs and handling all of our own engineering. The company was well versed in new construction, residential and commercial.

4. As a contractor, consultant, and building code official, I have evaluated several projects involving wind and hail damage to a commercial property, including SPF roofs.

5. I began performing expert work more than 30 years ago for Marvin Windows. In the design build practice, my company was the first design build contractor in the State of Minnesota. In the design build practice, we performed phase one, the initial design, design parameters and an architect's budget. Phase two consisted of full working drawings and a forensic investigation on the property which included cutting into walls to determine what the as-built condition of a property was.

6. Another aspect of my expert work during that time was representing homeowners and building owners and insurance companies in litigation concerning water damage to buildings.

7. Part of my current business is overseeing and monitoring both new construction and reconstruction including presale inspections and due diligence for buildings, banks, investment groups and individuals.

8. Specifically, in this case and consistent with industry methodology, I conducted a three-part inspection in this matter. The first part was visual on the site looking at the conditions on the site at the time primarily focused on the facades that includes the four sides of the building. The goal of the visual inspection is to look for anything indicative of this building changing from its original construction.

9. The second part of our inspection is the document review and looking at the damage chronology, building blueprints and service history of the building, and to interview tenants, building owners, and others who may have been there when the water discharge occurred.

10. The next phase was to conduct invasive inspections which revolved around the building, the

roof, and the interior.

11. Because of my background in construction, I also look at what actually needs to be done to put the damaged structure back to a pre-loss condition.

12. FBS, along with RJH & Associates, Inc. ("RJH"), were both retained in the above-cited case to serve as experts for the Plaintiff, Taslid Interests, Inc. As part of our engagement, as is customary, FBS and RJH personnel visited and performed a comprehensive inspection of the hotel property located at 9535 Katy Freeway, Houston, Texas 77024 (the "Property"). FBS and RJH completed the last phase of our evaluation, in the form of the research and report attached as Exhibit B to this declaration.

13. Based on our evaluation of the building and established methodology regarding the sequence and extent of the loss, our chief opinions are as follows:

> Based upon evidence collected from weather research and the physical inspection and roof, exterior wall and window assessment, we have concluded that the roof system, windows, some PTAC units, parapet walls, and some roof vents were damaged by the tornadic winds which occurred during the storm event. In addition, an overabundance of rain more than likely caused the roof system to be submerged causing water to damage the materials under the primary membrane, including adhesives, insulation and ceiling materials. These were still wet at the time of our inspection and will not recover. In our opinion, the low-slope built-up roof must be completely replaced. In our opinion, the current design of the parapet walls will not meet code at the time of the loss and will require complete replacement. In our report, complete replacement of the windows is necessary. The Work that has been done after the storm should be considered temporary in nature.
>
> Based upon our training, education, experience, a reasonable degree of building science and engineering certainty and the information gathered during our inspections and weather data search, it is more likely than not that the observed damage to the roofing system is a result of winds that occurred during Tropical Storm Harvey. On August 26-29, 2017 there was sufficient rain and wind to cause the above-referenced damage.
>
> Based on our interior inspection of the building, we have concluded that it is more likely than not, that the interior water damage we observed was a result of rainwater that entered after the winds created an opening to the building envelope during Tropical Storm Harvey, with the exception of the prior damage, as reported.
>
> Failure to completely remove and replace the damaged roof systems, windows, and parapets

at the property will result in additional damage to the interior due to water intrusion.

Damage to the property caused by wind and excessive rain occurred on or around August 26-28, 2017. Historic rainfall impacted the property during this time period where approximately 30" of rain was reported at the location of the Memorial Inn. According to our review of applicable weather data listed above in section 1, sustained windspeeds were estimated between 40-50 mpg with gusts reaching 50-60 mph. The wind speeds reported are general to the area and can vary at specific locations. They are subject to a +/- 20% margin of error and do not account for tornadoes. Tropical Storm Harvey spawned many tornadoes, radar records indicated one which was reported 2 miles east of the site. There were also several mesocyclones detected in the area, with one being reported ½ mile west of the site. In our opinion, the wind that occurred on or around August 27, 2017 was sufficient to cause damage to the windows, parapets and the roofing system. In our opinion, full replacement of the roof system is required. Ensuing interior water damage from the storm event will require interior repairs.

The City of Houston has adopted the 2015 International Energy Code (IECC). In our opinion, as the carrier has demostarted coverage for the removal and replacement of sections of the interior ceilings damaged by water from the storm, the remaining parts of the roof assembly up to the roof covering [working inside out] must also be replaced due to water damage. FBS cut roof cores and all cores were wet. In our opinion, additional coring will reveal either presence of water or signs that water did enter. Most if not all of the products used in the "roof Assembly" are not intended by the manufacturer to get wet and water damage to the materials directly behind the exterior roof envelope [the back side of the base sheet] are wet.

In our opinion, based on code language adopted by the City of Houston prior to the storm event, water damage to the interior ceilings from the storm event, which is not disputed, and discovery of wet materials in the roof assembly which includes not only the interior ceilings but also the roof assembly insulation, requires replacement of the wet insulation. In this case because of the concrete deck the only way to access the wet insulation is from the top, necessitating full roof replacement.

In our opinion, removal of the roof system to the concrete deck, drying out of the deck and installation of new above deck insulation with a new roof covering will be required as a result of damage from the storm event. Parapet walls will require replacement. New roof system will not allow for any gravel ballast.

In our opinion additional windows have been damaged by wind and require replacement. In our opinion, parging at the base of the structure was water damaged requiring removal and replacement. In our opinion, the scope of repairs allowed for by the carrier was deficient.

14. In order to properly repair the damage, our repair recommendations are as follows:

a) Follow all applicable building codes.
b) Remove all existing low-slope roofing materials down to the decking.
c) Dry down concrete to roofing insulation manufactures requirements prior to installing new roof system.
d) Install a minimum of 3" of tapered polyiso board above deck.
e) Relocate all scuppers to accommodate height change.
f) Build new parapet with parapet bracing to meet current code requirements. Note: This will require special engineering design.
g) Replace all removed roofing materials and appurtenances with new similar materials.
h) Remove and replace all water damaged materials on the porte-cochere.
i) Repair any storm damage related interior water damage.
j) Replace all storm damaged windows.
k) Replace any storm damaged through-wall air conditioning units.
l) Remove water damaged interior materials and effect repairs pursuant to current published guidelines by ANSI/IICRC S500 – "Water Damage Restoration." This will include interior environmental controls.
m) Alternate construction techniques may be acceptable provided a licensed design professional approves and signs and stamps plans and or shop drawings for these repairs. Means and methods are the contractor's responsibility.
n) Conform to any special inspection and testing schedules issued by the engineer.
o) Contractor is solely responsible for adherence to all applicable safety requirements for work at heights.
p) Contractor shall remain on alert for signs of mold during repairs and construction.
q) Energy code requirements have not been reviewed. Scope of work for this project is structural only. Integration of existing building systems with vapor retarders, application of sealants, flashing and other items are the responsibility of the contractor.
r) Stability during construction is the responsibility of the contractor. Structure as detailed is intended to be stable once all sheathing and fasteners are in place.

15. In January 2019, FBS was made aware that the City of Hedwig Village, Texas, had notified the owners of the Property that the building would need to be vacated. As a result, FBS conducted a follow-up inspection and created a supplemental report. That report is attached as Exhibit C to this declaration.

16. FBS's investigation showed additional damage to that which was initially observed in our inspection with RJH in 2018. Namely, we observed damage to the coatings applied to concrete masonry units, which is commonly known as "Lamina." (*See* Ex. C at 3.2). The Lamina became debonded on 80% of the bottom 18 inches of the Property, which caused water intrusion and

5

EXHIBIT 2

resultant damage. We attributed this intrusion to flood water. However, approximately 50% of the Lamina became debonded on the upper parts of the structure, which we attributed to openings to the windows, PTAC units, and the roof assembly.

17. Except for that damage to the bottom 18 inches of the Property as noted, we did not observe any other damage from water that entered the building under the doors of the rooms or from surface water overflow.

18. Based on my evaluation of the building and established methodology regarding building and construction costs and standards, the cost to perform the appropriate repair work is estimated to be $1,456,204.53. This amount does **not** include the damages attributable to flood water at the bottom 18 inches of the Property, as noted above.

19. I have considered the other potential causes raised by the consultants for the insurance carrier and have ruled them out. The cause of the loss and the damages contained within our report is the August 26-28, 2017 windstorm. Wear and tear, maintenance, deterioration to the property, and surface water have been evaluated and accounted for in our opinions. The August 26-28, 2017 windstorm caused the need to replace this roof system, windows, and other repairs recommended in our report.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of February, 2019

*Thomas Irmiter* (signature)

Thomas J. Irmiter
2168 Juliet Avenue
St. Paul, MN 55105  DOB: 10/19/57

EXHIBIT 2